UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ANASELIA COLON, o/b/o DIANE
COLON,

            Plaintiff,

      v.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

            Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 04-5508 (JEI)

**OPINION**

**APPEARANCES:**

POLONSKY & POLONSKY
By: Alan H. Polonsky, Esq.
512 South White Horse Pike
Audubon, New Jersey 08106
            Counsel for Plaintiff.

CHRISTOPHER J. CHRISTIE, UNITED STATES ATTORNEY
By: Suzanne Marie Haynes, Esq.
C/o Social Security Administration
26 Federal Plaza, Room 3904
New York, New York 10278
            Counsel for Defendant.

**IRENAS**, Senior District Judge:

      Anaselia Colon, on behalf of her minor daughter

("Claimant"), seeks judicial review, pursuant to 42 U.S.C.

§ 405(g) of the Social Security Act, of the final determination

of Defendant Jo Anne B. Barnhart, the Commissioner of the Social

Security Administration ("Commissioner"), denying her daughter's

application for Supplemental Security Income disability benefits

under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  For the
following reasons, this Court affirms the Commissioner's
decision.

## I.

On November 9, 2001, Anaselia Colon ("Colon") filed an
application for disability insurance benefits on behalf of her
minor daughter.  (R. at 80)  The application contended that
Claimant was entitled to benefits because she suffered from a
learning disability that began on June 1, 2000.  (R. at 80)  At
the time of the application, Claimant was ten years old.

The application was initially denied on June 5, 2002.  (R.
at 49-51)  Colon requested reconsideration by the Social Security
Administration of the initial denial, which on August 21, 2002,
was also denied.  (R. at 54-59)  Colon subsequently requested a
hearing before an Administrative Law Judge ("ALJ"), which was
held on January 4, 2004.  (R. at 25-44, 60)

In a decision dated April 14, 2004, ALJ Joseph Hillegas
denied the request for benefits, concluding that Claimant was not
disabled within the meaning of the Social Security Act.  (R. at
11)  ALJ Hillegas determined that Claimant suffered from a
learning disorder and was not engaged in substantial gainful
activity since the onset of her disability.  (R. at 19)  However,
her impairment did not meet or medically equal the criteria of

2

any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Appendix"), as required by 20 CFR § 416.924(d); nor did her impairment functionally equal the severity of any impairment described in the Appendix. (R. at 19)  Accordingly, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act at any time through the date of the ALJ's decision. (R. at 19)

The Appeals Council denied Colon's request for review of ALJ Hillegas' decision on September 10, 2004.  ALJ Hillegas' decision thus stands as the final decision of the Commissioner.  Colon filed the instant appeal with this Court on November 10, 2004.

## II.

Claimant was born on August 20, 1991.  It is undisputed that Claimant suffers from a learning disorder, however, the severity of that disability is disputed.  The record before the Court contains the testimony of Claimant and her mother from the hearing before ALJ Hillegas, educational and intellectual assessments of Claimant conducted by the Camden City Public Schools ("CCPS"), Gateway Group Child Study Team ("Gateway Group") and the New Jersey Division of Disability Determination Services ("NJDDDS"), as well as other school and medical records.

Claimant was originally evaluated and found eligible for special education services on April 17, 2000, when she was a

3

third grade student.  (R. at 232)  This evaluation appears to have been prompted by an intelligence quotient ("IQ") test administered to Claimant in  March, 2000, and her poor third grade mid-year report card.  The Weschler Intelligence Scale for Children-III ("WISC-III") test revealed that Claimant had a verbal IQ of 65, a performance IQ of 91 and a full scale IQ of 76.  (R. at 275)

The record contains the initial Individualized Education Program ("IEP") developed for Claimant by CCPS in April, 2000, for the following school year (2000-01).  (R. at 173-89)  The IEP states that Claimant "is currently functioning within the borderline to average range of intelligence" and recommends that she be placed in a "self-contained" educational program for reading, math, social studies, science and writing / language classes.  (R. at 175, 184)

A revised IEP issued in January, 2001, notes that Claimant's placement was changed from a regular fourth grade classroom to a special class for learning disabled students.  (R. at 172, 192) Two progress notes submitted by Claimant's teacher on February 5, and April 11, 2001, indicate that Claimant was a fluent reader but had problems with reading comprehension, and would benefit from more time in the learning disabled classroom.  (R. at 220-21)

CCPS developed an IEP for Claimant for the 2001-2 school

4

year (fifth grade) in May, 2001.  (R. 190-217)  The IEP notes that Claimant "is presently functioning below average in some areas such as Math and Reading Comprehension.  She appears to be making some progress at this time."  (R. at 192) The report also states that Claimant "is a competent oral readeer and an excellent speller, with no comprehension skills," and that she was placed in a second grade level math group.  (Id.)  The IEP recommended that Claimant remain in the self-contained learning disabled program for reading, math, social studies, science, and writing / language.

Prior to the start of her fifth grade year, Claimant moved from Camden to Westville, New Jersey, and switched to a new school.  A new IEP for the 2001-2 school year was prepared by the Gateway Group in September, 2001.  (R. at 157-71)  The report states that Claimant's "academic levels require remediation which is unable to be provided within the regular class even with supplementary aids and services," noting that Claimant suffers from "reading comprehension delays and overall cognitive concerns."  (R. at 159, 166)  This IEP also recommended that Claimant be placed in a special class for learning disabled students for literacy, math and social studies.

During the spring of 2002, Claimant moved back to Camden. In April, 2002, CCPS prepared an IEP for the 2002-3 school year, during which Claimant would have been a sixth grade student.  (R.

5

at 112-27)  The IEP notes that Claimant "displays a disorder in
one or more of the basic psychological processes involving
understanding or using language, spoken or written, that may
manifest itself in an imperfect ability to listen, think, speak,
read, write, spell or do mathematical calculations" and
recommends that Claimant be placed in a classroom for students
with "[l]earning and/or language disabilities-[m]ild to
[m]oderate."  (R. at 112)  It specifically recommends that
Claimant be placed in a self-contained classroom for students
with learning disabilities for reading, math, social studies,
science and writing / language classes.

In May, 2002, Claimant was referred to the NJDDDS for
evaluation, apparently in conjunction with her application for
disability benefits.  Claimant was administered a WISC-III test,
which revealed that she achieved a verbal IQ of 65, a performance
IQ of 75 and a full scale IQ of 68.  (R. at 275) Claimant's
subtest scores for the verbal domain were categorized as
"mentally deficient."  (R. at 275-6)  Within the performance
domain, her subtest scores ranged from average to "mentally
deficient."  (R. at 276)  The testing indicated that Claimant
functioned "within the mild range of mental retardation with
potential for functioning within the low performance domain" and
demonstrated "borderline intellectual functioning."  (R. at 275-
6)

6

During the summer before her sixth grade year, Claimant moved back to Westville and a new IEP was prepared by the Gateway Group for the 2002-3 school year.  (R. at 222-31)  This IEP recommends that Claimant be placed in a special classroom for students with learning disabilities for literacy, math and social studies classes, but would be placed in a regular classroom for science and other subjects.  (R. at 222)  The report notes that:

> [Claimant] is currently functioning 2 years below her grade level in reading, math and language. She requires repetition, rote practice and modeling to gain new skills. Comprehension is very weak. [Claimant] is a dependent worker. For these reasons she is unable to succeed in the general education program.

(R. at 224) This IEP was developed in September, 2002.

The Gateway Group conducted a three-year assessment of Claimant, pursuant to N.J.A.C. § 6A:14-3.8, in March, 2003.  (R. at 232-245)  In connection with this assessment, Claimant was administered a Weschler Abbreviated Scale of Intelligence ("WASI") evaluation on January 28, 2003.  (R. at 233)  Claimant's verbal IQ on this test was 78, her performance IQ was 86, and her full scale IQ was 80.  (Id.)  Her full scale IQ score placed her in the ninth percentile among children her age.  (Id.)  Her verbal score fell in the borderline range and her performance score was classified as low average.  (Id.)

Claimant's sixth grade teacher was interviewed as part of the three-year assessment.  The teacher stated that Claimant "has good decoding skills and comprehends material at a mid-third

7

grade level; however, she has difficulty with written language and math. . . . and seems to have a lot of difficulty understanding and recalling information." (Id.) Her teacher also described Claimant as "almost always stares blankly, often seems out of touch with reality, and often babbles to herself" and has trouble making new friends. (Id. at 234)

Claimant was also administered several subject-specific achievement tests in conjunction with the three-year assessment. Claimant scored in the "average" range in basic reading and spelling. (Id. at 235) She scored "below average" in written expression and visual motor integration, and "well below average" in reading comprehension and mathematics. (Id. at 235, 237-9) Her ranking on the various tests ranged from the third to the thirtieth percentiles. (Id. at 235-39)

The record also contains Claimant's scores from the Terra Nova standardized achievement test given in the spring of her sixth grade year. (R. at 269) Claimant's total score for reading, language and math placed her in the second percentile nationally. (Id.) She scored in the first percentile in reading, the twenty-eighth percentile in language and the third percentile in math. (Id.) Claimant's science and social studies scores fell in the fifth and fourteenth percentiles, respectively. (Id.) In all areas but language her scores fell in the below average category, while her language score was in

the average range.  (Id.)

The Gateway Group prepared Claimant's IEP for the 2003-4 (seventh grade) school year in May, 2003.[1]  (R. at 246-68) The IEP recommends that Claimant be placed in a resource classroom program for all of her academic subjects, a less restrictive program than the special classes she attended previously.  (Id. at 246) The report notes that Claimant's "weaknesses in written and oral language impact involvement in the regular education classroom."  (Id. at 248)

The IEP identifies particular problems with Claimant's academic performance, including "impoverished vocabulary, poor recall of facts, weak comprehension despite good decoding, withdrawn and passive;" "poor memory for math procedures, inadequate conceptual understanding, weak estimation controls, inadequate communication skills;" and "slow writing and lack of fluidity, problems arranging and organizing thoughts, lack of ability to self correct, impoverished vocabulary."  (Id. at 248, 250-1) The report also notes several of Claimant's strengths, including good decoding skills, spelling and high sight vocabulary.  (Id. at 250)

The record also includes what appears to be a partially completed Social Security Administration Disability Evaluation

_____

[1]It appears that Claimant attended seventh grade in Camden, rather than Westville, but the record does not contain an IEP for 2003-4 from CCPS.

9

Form.  (R. at 277-82)  The evaluator, I.B. Weitzman, Ph.D.,
concluded that Claimant's "impairment or combination of
impairments is severe, but does not meet, medically equal or
functionally equal the listings."  (R. at 277)  Dr. Weitzman
signed the form on June 4, 2002.  (R. at 278)  Allan M. Hochberg,
Ph.D., reviewed Claimant's file and affirmed Dr. Weitzman's
assessment on August 13, 2002.  (Id.)

      The Disability Evaluation Form also includes a separate
section regarding whether Claimant's disability functionally
equals a listed impairment.  (Id. at 279-82)  It is not clear
from the form who completed this portion of Claimant's
evaluation, as no signature or stamp is affixed.  The evaluator
concluded that Claimant showed a marked limitation in acquiring
and using information.  (Id. at 279) The evaluator determined
that Claimant exhibited no limitation in the domains of attending
and completing tasks, interacting and relating with others,
moving about and manipulating objects, caring for yourself, and
health and physical well-being.  (Id. at 279, 281)  The evaluator
concluded that Claimant's learning disability did not
functionally equal any of the listed impairments.

      At the hearing before ALJ Hillegas, Claimant testified that
she was in seventh grade and received grades of B and C in her
classes.  (R. at 26-7) She further testified that her favorite
subject was computers and her worst class was mathematics.  (R.

                              10

at 27) Claimant stated that she was studying multiplication, and had learned the multiplication tables up to the number four. (R. at 28) She stated that she received tutoring only in mathematics. (R. at 28, 34) She testified that she liked her teachers and that she asked them for help when needed. (R. at 29) Claimant stated that she was sometimes able to complete her classroom work and usually finished her homework. (R. at 29-30)

ALJ Hillegas also questioned Claimant regarding her relationships with other children and her family. Claimant testified that she got along with her classmates and mentioned one friend by name. (R. at 30) She stated that she did not always get along with her younger sister. (R. at 31) Claimant testified that she did not have any friends in her neighborhood. (R. at 32)

Claimant further testified that she had some difficulties in taking care of herself, and she needed help from her mother in taking a shower and getting dressed. (R. at 33) She specifically mentioned that she needed help washing her hair because she did not know how much shampoo to use. (Id.)

Claimant's mother also testified at the hearing before ALJ Hillegas. Colon could not confirm her daughter's testimony that the child had been placed in mainstream classrooms except for mathematics, but stated that her daughter did not bring home any homework. (R. at 36) Colon testified that she often had to

11

repeat things many times when speaking to her daughter because
Claimant would not remember. (Id.) She stated that her daughter
was not making progress in school and was not more focused. (R.
at 36-7) Colon also testified that Claimant did not comprehend
anything she read. (R. at 40) She further stated that she did
not send Claimant anywhere by herself, such as to the store,
because the child would get lost. (R. at 41) She did allow
Claimant to walk with her younger sister to Colon's mother-in-
law's house, which was five minutes away from their home. (Id.)

Colon testified that it did not appear that her daughter had
any friends at school in Camden, although she had friends at her
school in Westville. (R. at 39) She stated that Claimant was
very quiet around other people and kept to herself. (R. at 39-
40) Colon testified that Claimant did not get into trouble at
school. (R. at 40)


## III.

The standard of review used by courts in reviewing final
determinations of the Commissioner is set forth in 42 U.S.C.
§ 405(g) and 42 U.S.C. § 1383(c)(3). Findings of fact by the
Commissioner that are supported by "substantial evidence" are
conclusive. 42 U.S.C. § 405(g); 42 U.S.C. § 1283(c)(3).
Substantial evidence has been defined as "such relevant evidence
as a reasonable mind might accept as adequate to support a

12

conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980).  The administrative decision "should be accompanied by a clear and satisfactory explanation of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

The decision should indicate not only the evidence that supports the ALJ's conclusion, but also any "significant probative evidence" that was rejected and the reasons for its rejection.  *Id.* at 705.  The Third Circuit has elaborated further on the proper standard of review stating:

> [O]ur decisions make clear that determinations of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

In reaching a conclusion that a claimant is capable of performing a certain category of work, the ALJ must analyze and explain the weight he has given to all probative evidence.  *Gober v. Mathews*, 574 F.2d 772, 776-77 (3d Cir. 1978).  Although deference is given to administrative decisions, it is the duty of the reviewing court to scrutinize the entire record to determine whether the ALJ's findings are rational and supported by substantial evidence.  *Id.*  It is within this Court's discretion

to affirm, modify, or reverse a Commissioner's final decision
with or without remand.  42 U.S.C. § 405(g); *Podedworny v.
Harris,* 745 F.2d 210, 221 (3d Cir. 1984).

### IV.

An ALJ employs a three-step process when evaluating a
child's claim of disability.  20 C.F.R. § 416.924.  In the first
step, the ALJ must determine whether the claimant is currently
engaged in "substantial gainful activity" as defined in 20 C.F.R.
§ 416.972.  § 416.924(b).  If the claimant is so engaged, her
application will be denied.  § 416.924(b).

The ALJ next determines whether the child has "a medically
determinable physical or mental impairment or combination of
impairments that causes marked and severe functional limitations,
and that can be expected to cause death or that has lasted or can
be expected to last for a continuous period of not less than 12
months."  § 416.906.  A claimant who does not have a "severe
impairment" is not disabled.  § 416.924(c).

Finally, in order to be considered disabled for the purposes
of the Social Security Act, the claimant's impairment must meet,
or be medically or functionally equal in severity to, an
impairment listed in the Appendix.  § 416.924(d).  A claimant's
impairment medically equals a listing when "the medical findings
are at least equal in severity and duration of the listed

14

findings." § 416.926(a).  An ALJ will compare medical evidence
in the record to corresponding medical criteria shown for the
listed impairment to make this determination.  § 416.926(a).

If a claimant's impairment does not meet or medically equal
a listed impairment, the ALJ will next determine if the
impairment is functionally equal to the listed impairments.
§ 416.926a(a).  To satisfy the "functionally equal" standard, a
claimant must show that she suffers from an impairment of
"listing-level" severity, meaning that the impairment "results in
'marked' limitations of two domains of functioning or 'extreme'
limitation in one domain." § 416.926a(a).  A child's functional
domains are evaluated within six categories: (1) acquiring and
using information; (2) attending and completing tasks; (3)
interacting and relating with others; (4) moving about and
manipulating objects; (5) caring for yourself; and (6) health and
physical well-being.  § 416.926a(b)(1)(i)-(vi).

A child demonstrates a "marked" limitation in a domain if
the child's impairment seriously interferes with her ability to
"independently initiate, sustain or complete activities."
§ 416.926a(e)(2)(i).  A "marked" limitation is one that is "more
than moderate" but "less than extreme." *Id.*  An "extreme"
limitation interferes very seriously with a child's ability to
"independently initiate, sustain or complete activities."
§ 416.926a(e)(3)(I).  An extreme limitation is more than marked

15

but does not mean a total lack or loss of ability to function.
*Id.*


## V.

In this case, the first two steps of ALJ Hillegas'
determination are uncontested.  Claimant has never been engaged
in substantial gainful activity.  (R. at 13)  The ALJ concluded
that Claimant's learning disorder was a severe impairment because
the disorder caused more than minimal functional limitations and
had lasted for more than twelve months.  (R. at 13)  Claimant
contests the ALJ's determination at the third stage of the
process that her impairment did not meet, or medically or
functionally equal, a listed impairment.  (R. at 13)

ALJ Hillegas concluded that "[i]n particular, the medical
evidence of record does not contain evidence of mental
retardation severe enough to meet the requirements of Section
112.05, Appendix 1, Subpart P, Regulations No. 4." (R. at 13)  He
further noted that "[n]o treating, examining, or non-examining
medical source has mentioned findings or rendered an opinion that
the claimant's impairment medically equals the criteria of any
listed impairment."  (R. at 13) Additionally, he determined that
Claimant displayed "less than marked" limitations in the
functional domains of acquiring and using information, attending
and completing tasks, and interacting and relating with others,

16

and no limitations in the other domains.   (R. at 17-8)

## A.

Claimant argues that ALJ Hillegas' explanation of his conclusion that Claimant's learning disorder does not meet or medically equal any listed impairment is insufficient and fails to meet the requirements of *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000).  In *Burnett*, the Third Circuit determined that an ALJ's conclusory statement that the claimant's impairment did not meet or equal any listed impairment was inadequate because it did not permit any meaningful judicial review of the ALJ's decision. *Id.* at 119-120.  The Court remanded the case for further discussion of the evidence and an explanation of the reasoning supporting the ALJ's determination that the claimant's impairment, although severe, did not meet or equal any listed impairment.  *Id.* at 120.

ALJ Hillegas' discussion of whether Claimant's impairment met or medically equalled any of the listed impairments, while not extensive, is distinguishable from the opinion in *Burnett*. Unlike *Burnett*, the ALJ here identified the specific listing in the Appendix to which he was referring, Section 112.05, pertaining to mental retardation.  *See Jaramillo v. Commissioner*, 130 Fed. Appx. 557, 561 (3d Cir. 2005)(distinguishing *Burnett* on ground that ALJ identified specific listed impairment).

17

Moreover, ALJ Hillegas discussed in some detail the evidence presented by Claimant in conjunction with his conclusion that Claimant's impairment did not functionally equal a listed impairment.  In *Santiago v. Commissioner*, 131 Fed. Appx. 344 (3d Cir. 2005), the Third Circuit held that the ALJ's opinion met the *Burnett* standard due to the detailed analyis of the six functional domains, and such discussion allowed for meaningful review of the ALJ's determination that the claimant's impairment did not meet or medically equal any of the listed impairments. Here, the ALJ's discussion of the evidence in relation to the six functional domains is sufficient to allow for meaningful judicial review of his decision.  *See also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)(ALJ must only provide a "sufficient development of the record and explanation of findings to permit meaningful review."); *Albury v. Commissioner*, 116 Fed. Appx. 328, 330 (3d Cir. 2004)("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").

The listing for mental retardation in Section 112.05 of the Appendix provides that this impairmant is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."  Appendix, § 112.05.  The required level of severity is met if a claimant can satisfy one of six requirements found in Section 112.05(A)-(F).  The requirements relevant to Claimant's condition include:

18

D.  A valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;

OR

E.  A valid verbal, performance or full scale IQ of 60 through 70 and:

. . .

2.  For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02;[2]

OR

F.  Select the appropriate age group:

. . .

2. For children (age 3 to the attainment of age 18), resulting in the satisfaction of 112.02B2a,[3] and a

_____

[2]Section 112.02(B)(2) provides in relevant part:
b.  Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
c.  Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
d.  Marked difficulties in maintaining concentration, persistence, or pace.

[3]Section 112.02(B)(2)(a) provides:
Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary,

19

> physical or other mental impairment imposing an
> additional and significant limitation of function.

*Id*.

The record contains the results of three sets of IQ tests
for Claimant, from March, 2000, May, 2002, and January, 2003.
Section 112.00(D)(10) provides that IQ test scores above 40 for
children between the ages of seven and sixteen are current for
two years.  Appendix, § 112.00(D)(10).  Thus, at the time of ALJ
Hillegas' decision in April, 2004, only the May, 2002, and
January, 2003, testing results were current.

On the May, 2002, WISC-III test, Claimant attained a verbal
scale IQ of 65, a performance scale IQ of 75, and a full scale IQ
of 68.  On the January, 2003, WASI test, Claimant's verbal scale
IQ was 78, her performance scale IQ was 86, and her full scale IQ
was 80.  Section 112.00(D)(9) provides that for tests in the
Weschler series, including the WISC-III and WASI, the lowest of
the three scale scores should be used in conjunction with the
mental retardation listings in Section 112.05.  Appendix,
§ 112.00(D)(9).  Claimant thus had a valid verbal scale IQ of 65
and a valid full scale IQ of 68 on the May, 2002, test, bringing
her within the requirements of Section 112.05(D) and (E)(2), both
of which require a valid score of 60 through 70.

Claimant maintains that the record contains evidence of

the results of appropriate standardized tests.

20

other impairments that the ALJ should have considered and discussed in determining whether she met the requirements of Section 112.05(D). This subsection requires a qualifying IQ test score plus "a physical or other mental impairment imposing an additional and significant limitation of function." Appendix, § 112.05(D). Section 112.05(F)(2) also requires proof of such an impairment. Claimant suggests that she was diagnosed with Attention Deficit / Hyperactivity Disorder ("AD/HD").[4] Although there are indications in the record that Claimant has problems paying attention in school, the Court cannot find any evidence in the record that Claimant has been given such a diagnosis. As ALJ Hillegas noted, "[n]o treating, examining, or non-examining medical source has mentioned findings or rendered an opinion that the claimant's impairment medically equals the criteria of any listed impairment." (R. at 13)  Claimant bears the burden of producing evidence that she suffers from an additional impairment such as AD/HD. *See Ballardo v. Barnhart*, 68 Fed. Appx. 337, 338 (3d Cir. 2003)("a claimant bears the burden of producing evidence

---

[4]While Claimant also suffers from high cholesterol and scoliosis, she does not allege that either of these conditions has limited her functioning.

Claimant contends that testimony regarding her "difficulties in functioning with others" would be sufficient to conclude that she was disabled under Section 112.05(D). However, this section, as well as Section 112.05(F)(2), require proof of an impairment *in addition* to a claimant's mental retardation, and not simply proof that the claimant's functioning was limited in an aspect other than her performance on IQ tests.

that her impairment is equivalent to a listed impairment").

Claimant also contends that the ALJ should have discussed whether she met the requirements for a disability as set out in Section 112.05(E)(2).  That section requires a qualifying IQ score and a marked impairment in a claimant's age-appropriate cognitive/communicative, social or personal functioning.  Here, ALG Hillegas discusses these aspects of Claimant's functioning in some detail in the section of his opinion regarding whether Claimant's impairment was functionally equivalent to a listed impairment.  (R. at 13-18)

In assessing Claimant's functional limitations, ALJ Hillegas reviewed Claimant's IQ test scores, school records, the report of the consulting doctor, the comments of Claimant's teachers and the testimony of Claimant and her mother.  (R. at 17-18)  He concluded that while Claimant exhibited borderline intellectual functioning, attention deficits and some social difficulties, her limitations in these areas were less than marked in degree.  (R. at 19)  This discussion of the evidence in relation to the six functional domains is sufficient to allow a court to conduct a meaningful review of the ALJ's determination that Claimant did not meet the requirements of Section 112.05(E)(2), and thus does not run afoul of *Burnett*.

**B.**

Claimant also argues that the ALJ's determination that she suffered from a "less than marked" limitation in the functional domain of acquiring and using information lacked any rationale and was not supported by substantial evidence.  A "marked" limitation in a functional domain means that the child's impairment seriously interferes with her ability to "independently initiate, sustain or complete activities." § 416.926a(e)(2)(i).

A school-age child (age six to attainment of age twelve) should be able to acquire and use information so that she can learn to read, write, do math, and discuss history and science. § 416.926a(g)(2)(iv).  She is expected to use these skills in academic and daily living situations.  § 416.926a(g)(2)(iv).  An adolescent (age 12 to attainment of age 18) should be able to acquire and use information so that she can use increasingly complex language and apply her skills in practical ways so as to prepare her for the workplace.  § 416.926a(g)(2)(v).

The ALJ's decision cited school records, three sets of IQ scores and the testimony of an expert who diagnosed the Claimant as falling "in the borderline range" of mental retardation before concluding that the Claimant suffered from significant limitations in the domain of acquiring and using information, but that this limitation was less than marked.  (R. at 17-18)  The

23

ALJ noted Claimant's testimony that she was currently attending regular classes, receiving tutoring in math and achieving passing grades on her school work.  (R. at 17)  She was described by her teacher as cooperative, organized and possessing good work habits and that she responded when called on in class.  (R. at 18)  The records also show that while Claimant lagged behind her peers, she continued to progress in her abilities.

This evidence supports the conclusion that Claimant's impairment does not seriously interfere with her ability to independently initiate, sustain or complete activities in the domain of acquiring and using information.  After consideration of the entire record, this Court concludes that there is substantial evidence to support the ALJ's decision that the Claimant's limitation in acquiring and using information, though significant, was less than marked.

## VI.

For the aforementioned reasons, the Court will affirm the the final decision of the Commissioner denying Claimant's application for disability benefits.  The Court will issue an appropriate order.

Dated: March _1_, 2006

s/Joseph E. Irenas
JOSEPH E. IRENAS, S.U.S.D.J.